288 F.3d 1097
 John Louis VISCIOTTI, Petitioner-Appellee-Cross-Appellant,
v.
Jeanne WOODFORD, Warden of California State Prison at San Quentin, Respondent-Appellant-Cross-Appellee.
 No. 99-99031.
 No. 99-99032.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted December 6, 2001.
 Filed April 24, 2002.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED John T. Swan, Deputy Attorney General, San Diego, CA, for the respondent-appellant-appellee.
 William H. Forman and Statia Peakheart, Deputy Federal, Public Defenders, Los Angeles, CA, for the petitioner-appellee-cross-appellant.
 Appeal from the United States District Court for the Central District of California, Manuel Real, District Judge, Presiding. D.C. No. CV 97-04591-R.
 Before: PREGERSON,TASHIMA, and BERZON, Circuit Judges.
 
 OPINION
 
 1
 PREGERSON, Circuit Judge, authored Sections I, II, and III-B, with which Judges TASHIMA and BERZON concur. TASHIMA, Circuit Judge, authored Section III-A, with which Judge BERZON concurs, and from which Judge PREGERSON dissents.
 
 
 2
 John Visciotti ("Visciotti"), a California state prisoner, was convicted of first degree murder, attempted murder, and robbery, and sentenced to death. After exhausting his claims in state court, Visciotti brought a federal habeas petition alleging, among other claims, ineffective assistance by his counsel during the guilt and penalty phases of his trial. The district court granted Visciotti's habeas petition as to his sentence but denied habeas relief as to his conviction. Warden Woodford appealed and Visciotti cross-appealed the district court's decision. We affirm the district court's decision in its entirety.[1]
 
 I.
 
 3
 The following events, as described by the California Supreme Court, led to Visciotti's prosecution and conviction.
 
 
 4
 [Visciotti] and Brian Hefner, both of whom had been employed as burglar alarm salesmen by Global Wholesalers in Garden Grove [California], and who shared a motel room, were fired by their employer on November 8, 1982. Because their final paychecks were insufficient to cover future rent, they devised a plan to rob fellow employees who were also to be paid on that date. The pair waited in the company parking lot until another group of employees, among whom were [Timothy] Dykstra and [Michael] Wolbert, returned from their shifts. They invited Dykstra and Wolbert to join them at a party which, they claimed, was to be held at the home of friends in the Anaheim Hills area.
 
 
 5
 Dykstra and Wolbert agreed to go to the party. They did not know [Visciotti] and Hefner well, however, and were cautious. They insisted on driving in Wolbert's car. They also removed most of their cash from their wallets and hid it behind the dashboard of their car. After leaving [Visciotti's] car at an apartment complex, the four drove to a remote area on Santiago Canyon Road where [Visciotti] asked Wolbert to stop so that defendant could relieve himself. It was then between 7 and 9 p.m.
 
 
 6
 All four men left the car, Dykstra getting out first to permit [Visciotti] to leave. After the other three men left the car, Wolbert saw a gun in [Visciotti's] waistband. Wolbert then left the car and when he next looked at [Visciotti] he saw that [Visciotti] and Dykstra were standing face-to-face about two feet apart, with [Visciotti] holding the gun pointed at Dykstra. [Visciotti] demanded the victims' wallets. Wolbert told [Visciotti] where the money was hidden. Dykstra and Wolbert then stayed on an embankment, several feet apart, while Hefner searched for the money.
 
 
 7
 [Visciotti] moved to stand by Wolbert, who asked [Visciotti] to let them go, told him to take the car and the money, and assured him that he would not identify him. When Hefner left the car, [Visciotti] moved back toward Dykstra who was sitting down. [Visciotti] then raised the gun in one hand and shot Dykstra from a distance of about three or four feet....
 
 
 8
 After [Visciotti] shot Dykstra, Wolbert stood up and stepped back. [Visciotti] approached Wolbert, who was backing up, raised the gun in both hands, and shot Wolbert three times....
 
 
 9
 In spite of his life-threatening wounds, Wolbert did not lose consciousness. He heard defendant and Hefner get into the car and drive back down the road. He was later able to attract the attention of passersby who summoned aid. He identified his assailants as fellow employees at Global Wholesalers. Dykstra was dead when paramedics arrived. Wolbert was transported to the hospital where he underwent surgery. On the following morning, he identified both defendant and Hefner in a photographic lineup, identifying [Visciotti] as the person who had shot him and Dykstra.
 
 
 10
 [Visciotti] and Hefner were arrested as they left their motel room about 9 a.m. on the morning after the robbery and murder. The murder weapon, a.22 caliber single action revolver which still held six expended shell cases in the cylinder, was found hidden in a space behind the bathroom sink. [Visciotti] confessed his involvement and, at the request of the investigating officers, participated in a videotaped reenactment of those events that had taken place in Santiago Canyon.
 
 
 11
 Analysis of a sample of [Visciotti's] blood, taken at approximately noon on November 9, 1982, revealed no alcohol, amphetamines, opiates, barbiturates, or phencyclidine (PCP). Cocaine and benzoylecgonine, a metabolite of cocaine, were present, however.
 
 
 12
 People v. Visciotti, 2 Cal.4th 1, 28-30, 5 Cal.Rptr.2d 495, 825 P.2d 388 (1992).
 
 
 13
 Roger Agajanian ("Agajanian") was retained by Visciotti's father to represent Visciotti during pretrial proceedings, through trial, and on appeal. Agajanian was admitted to the California bar in July 1973. In re Visciotti, 14 Cal.4th 325, 336, 58 Cal.Rptr.2d 801, 926 P.2d 987 (1997). He had never tried a capital case that went to a jury or conducted a penalty phase trial before representing Visciotti, though he had represented clients charged with murder. Id. at 336, 58 Cal.Rptr.2d 801, 926 P.2d 987. Agajanian was suspended from the State Bar of California in 1990, 1991, and 1993, and resigned from the California bar in 1994.[2] Id. at 349 n. 6, 58 Cal.Rptr.2d 801, 926 P.2d 987.
 
 Trial Proceedings
 
 14
 Visciotti was tried by a jury in July 1983 in the Superior Court of the State of California, County of Orange. During the guilt phase of Visciotti's trial, the surviving victim, Michael Wolbert, testified on behalf of the prosecution. The prosecution additionally introduced as evidence Visciotti's videotaped confession and reenactment.
 
 
 15
 Dr. Louis Broussard ("Dr.Broussard") testified as a witness for the defense. Dr. Broussard testified that Visciotti "had minimal brain injury of a type associated with impulse disorders and specific learning disorders." Visciotti, 2 Cal.4th at 32, 5 Cal. Rptr.2d 495, 825 P.2d 388. He admitted during cross-examination, however, that he had not reviewed Visciotti's videotaped confession and reenactment, and would have conducted additional psychological testing and additional interviews had he had enough time to do so.
 
 
 16
 Visciotti testified on his own behalf. During Agajanian's direct examination, Visciotti described the night of the crimes consistently with the videotaped confession and reenactment. Agajanian also elicited information from Visciotti about his prior juvenile and misdemeanor offenses. Visciotti also admitted that he had been convicted of assault with a deadly weapon, and described the facts underlying this felony conviction. Visciotti testified that the assault occurred after two men broke down the door to his motel room and one, William Scofield ("Scofield"), cut Visciotti's roommate's throat with a knife, while a third man, armed with a gun, stood at the doorway. Visciotti testified that when the three men fled, Visciotti picked up the knife dropped by Scofield, ran after the men, and stabbed Scofield outside Scofield's motel room.
 
 
 17
 The prosecution contradicted Visciotti's description of the circumstances of the assault through its cross-examination of Visciotti and through the testimony of a police officer the prosecution called as a rebuttal witness. The prosecution elicited testimony from Visciotti and the police officer that Visciotti had broken into Scofield's room and stabbed both Scofield and Kathy Cusack ("Cusack"), a pregnant woman who was in Scofield's bed at the time.
 
 
 18
 The jury found Visciotti guilty of murder, attempted murder, and armed robbery, with a special circumstance finding that the murder was committed during the commission of a robbery.[3]
 
 
 19
 During the penalty phase of Visciotti's trial, Scofield and Cusack[4] testified for the prosecution in support of its case in aggravation. Scofield's and Cusack's descriptions of the circumstances underlying Visciotti's assault conviction were consistent with that of the police officer who testified during the guilt phase. Agajanian called Visciotti's parents and siblings to testify during the penalty phase. As Agajanian later explained, his mitigation strategy was to elicit sympathy for Visciotti's family "in an attempt to make it more difficult for the jury to decide this family's one stray, its son and brother, should be executed." In re Visciotti, 14 Cal.4th at 347, 58 Cal. Rptr.2d 801, 926 P.2d 987. Visciotti was sentenced to death.
 
 
 20
 On automatic appeal, the California Supreme Court affirmed Visciotti's conviction, with one justice dissenting. People v. Visciotti, 2 Cal.4th 1, 5 Cal.Rptr.2d 495, 825 P.2d 388 (1992).
 
 Habeas Proceedings
 
 21
 Visciotti filed a petition for a writ of habeas corpus in the California Supreme Court. The California Supreme Court appointed a referee[5] to hold an evidentiary hearing and make findings of fact relating to Visciotti's claim that Agajanian provided ineffective assistance of counsel during the penalty phase. After the referee held the hearing and made findings of fact, and after briefing on the merits, the California Supreme Court denied Visciotti's petition in its entirety, with one justice concurring separately and two justices dissenting. In re Visciotti, 14 Cal.4th 325, 58 Cal.Rptr.2d 801, 926 P.2d 987. The California Supreme Court assumed that Agajanian provided constitutionally inadequate representation during the penalty phase, but concluded that these inadequacies did not prejudice the jury's sentencing decision.
 
 
 22
 Visciotti, with the assistance of court-appointed counsel, filed a federal habeas petition on June 23, 1998. Judge Real of the United States District Court for the Central District of California held a three-day hearing on Visciotti's claims (except for Visciotti's claim of ineffective assistance of counsel during the penalty phase, as the state court had already held a hearing on that claim). Following this evidentiary hearing, Judge Real determined that Visciotti had been denied effective assistance of counsel during the penalty phase, and granted Visciotti's habeas petition as to his sentence.[6] Judge Real also determined that Agajanian's performance during the guilt phase of the trial was not unconstitutionally deficient or prejudicial and denied Visciotti's other claims.
 
 
 23
 The state timely appealed Judge Real's decision to grant habeas relief on Visciotti's ineffective assistance of counsel claim as to Visciotti's sentence. Visciotti cross-appealed Judge Real's decision to deny habeas relief on Visciotti's ineffective assistance of counsel claim as to Visciotti's conviction. Visciotti does not appeal Judge Real's dismissal of Visciotti's other claims.
 
 II. Standard of Review
 
 24
 A federal court may grant a writ of habeas corpus to a state prisoner only if the state court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or were "based on an unreasonable determination of the facts in light of the evidence presented" in the state courts.[7] 28 U.S.C. § 2254(d). Under the "contrary to" clause, a state court's decision is contrary to federal law if it "failed to apply the correct controlling authority from the Supreme Court." Shackleford v. Hubbard, 234 F.3d 1072, 1077 (9th Cir.2000); see also Williams v. Taylor, 529 U.S. 362, 405-07, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); LaJoie v. Thompson, 217 F.3d 663, 667-68 (9th Cir.2000); Van Tran v. Lindsey, 212 F.3d 1143, 1150 (9th Cir.2000). A state court decision is an "unreasonable application" of Supreme Court law if the state court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Williams, 529 U.S. at 407-08, 120 S.Ct. 1495. In order to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." Id. at 409, 120 S.Ct. 1495.
 
 III. Discussion
 
 25
 A. Agajanian's Performance During the Guilt Phase
 
 
 26
 Unlike its lengthy discussion concerning Agajanian's performance at the penalty phase of the trial, the California Supreme Court denied Visciotti's claim of ineffective assistance of counsel at the guilt phase of his trial without providing a reasoned explanation. Instead, the state court simply stated that by issuing an order to show cause that was limited to counsel's penalty phase performance, it had "implicitly concluded" that the other claims failed to "state a prima facie case." In re Visciotti, 14 Cal.4th at 329, 58 Cal.Rptr.2d 801, 926 P.2d 987 (citing People v. Miranda, 44 Cal.3d 57, 119 n. 37, 241 Cal.Rptr. 594, 744 P.2d 1127 (1987) (noting that the issuance of a limited order to show cause in a habeas case is an implicit determination of petitioner's failure to make a prima facie case on the other claims in his petition); People v. Bloyd, 43 Cal.3d 333, 362-63, 233 Cal.Rptr. 368, 729 P.2d 802 (1987) (same)).
 
 
 27
 On habeas review, when there is no reasoned state court decision to review, we must conduct "an independent review of the record ... to determine whether the state court clearly erred in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.2000) (citing Van Tran, 212 F.3d at 1153). In doing so, because there is no state court decision, we must "focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law." Fisher v. Roe, 263 F.3d 906, 914 (9th Cir.2001). Habeas relief cannot be granted "simply because the California Supreme Court's disposition of the case was inconsistent with our own precedent." Id.
 
 
 28
 To prevail on a claim of ineffective assistance of counsel, a petitioner must show that: (1) "counsel's performance was deficient;" and (2) "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In this case, although it seems likely that Agajanian's performance at the guilt phase of the trial was deficient, we need not resolve that issue because we conclude that Visciotti suffered no prejudice as a result of the alleged deficiencies. See Mayfield v. Woodford, 270 F.3d 915, 925 (9th Cir.2001) (en banc) (citing Strickland, 466 U.S. at 697, 104 S.Ct. 2052).
 
 
 29
 To demonstrate prejudice, a defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.
 
 
 30
 The strength of the prosecution's evidence against Visciotti for first degree murder under the felony murder rule and for attempted murder made it highly unlikely that even a highly competent performance by Agajanian could have altered the jury's verdict. To convict Visciotti under the felony murder rule, the jurors were not required to find malice or premeditation; the "only criminal intent required [was] the specific intent to commit the [robbery]." People v. Dillon, 34 Cal.3d 441, 475, 194 Cal.Rptr. 390, 668 P.2d 697 (1983) (internal quotation marks and citation omitted).
 
 
 31
 The prosecution adduced the testimony of the surviving victim, Wolbert, who knew Visciotti from his workplace and unambiguously identified him as the man who had robbed and shot Dykstra and Wolbert, killing Dykstra. The prosecution also introduced two videotapes in which Visciotti confessed to his plan and intent to rob the men and his knowing and intentional shooting of them during the course of that robbery. One of the videotapes, referred to by the state court as a "re-enactment," see In re Visciotti, 14 Cal.4th at 355, 58 Cal.Rptr.2d 801, 926 P.2d 987, featured Visciotti at the scene of the crime admitting to his involvement in the robbery and shootings, describing the chain of events, and even pointing out the locations where the individual events had transpired.
 
 
 32
 There was only minimal evidence supporting a defense that Visciotti lacked the ability to form the requisite intent for the underlying robbery charge due to his drug use. On the other hand, the evidence against such a claim, including Wolbert's testimony about Visciotti's demeanor at the time of the crime and Visciotti's own videotaped recollection of the details of his and Hefner's plans to rob and their subsequent robbery of Wolbert and Dykstra, was substantial and convincing. In light of this strong inculpatory evidence and the weakness of any contrary evidence, we are confident that even a highly competent performance by Agajanian at the guilt phase would not have affected the verdict.
 
 
 33
 Visciotti contends, however, that Agajanian's flawed performance at the guilt phase of the trial requires the application of the per se prejudice rule. In Sixth Amendment right to counsel cases, the Supreme Court has presumed prejudice where there are "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." United States v. Cronic, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Strickland, Cronic, and the cases that follow Cronic have made clear that this exception is limited to the "complete denial of counsel" and comparable circumstances, including: (1) where a defendant "is denied counsel at a critical stage of his trial"; (2) where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing"; (3) where the circumstances are such that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial"; and (4) where "counsel labors under an actual conflict of interest." Id. at 659-61, 662 n. 31, 104 S.Ct. 2039; see also Smith v. Robbins, 528 U.S. 259, 120 S.Ct. 746, 764-65, 145 L.Ed.2d 756 (2000) (noting that there is no presumption of reliability where there has been a complete denial of counsel, where the state has interfered with counsel's assistance, or where counsel is burdened by a conflict of interest); Penson v. Ohio, 488 U.S. 75, 88-89, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988) (holding that a complete denial of counsel on appeal requires a presumption of prejudice); Strickland, 466 U.S. at 692, 104 S.Ct. 2052 (noting an assumption of prejudice where there is an "actual or constructive denial of ... counsel altogether"). Apart from circumstances of this nature and magnitude, "there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." Cronic, 466 U.S. at 659 n. 26, 104 S.Ct. 2039 (citing Strickland, 466 U.S. at 693-96, 104 S.Ct. 2052).
 
 
 34
 As noted above, Agajanian's overall performance at the guilt phase of the trial may well have been deficient. His shortcomings included his insufficient investigation and preparation for trial and the limited range of his defense arguments. The foregoing notwithstanding, the record demonstrates at least some efforts by Agajanian to advocate Visciotti's case during the guilt phase. Agajanian put on a defense mental health expert, Dr. Louis Broussard, made objections, and cross-examined the prosecution's witnesses. There is also nothing in the record to indicate that Agajanian had a conflict of interest, sympathized with the prosecution, was hostile to his client, or wanted him to be convicted. Under these circumstances, we cannot conclude that Agajanian's overall performance at the guilt phase "entirely failed to subject the prosecution's case to meaningful adversarial testing," Cronic, 466 U.S. at 659, 104 S.Ct. 2039, or that Agajanian left Visciotti "completely without representation at the guilt phase," Penson, 488 U.S. at 88, 109 S.Ct. 346.
 
 
 35
 The record also does not support the contention that Agajanian abandoned Visciotti "at a critical stage of his trial" by conceding in his closing argument that there was no reasonable doubt that Visciotti was guilty of first degree murder. In United States v. Swanson, 943 F.2d 1070 (9th Cir.1991), the case on which Visciotti and the dissent rely, this court concluded that the defense attorney's concession during closing arguments that there was no reasonable doubt that his client had intimidated the victims and robbed the bank was an abandonment of the defense of his client "at a critical stage of his trial" and a breakdown in our adversarial system of justice. Unlike the defense attorney's closing argument in Swanson, however, Agajanian's closing argument, although it may be criticized as deficient and ineffective, cannot properly be characterized as an "abandonment" of his client, warranting application of the Cronic exception and a presumption of prejudice.
 
 
 36
 Although a few of Agajanian's statements can be interpreted as a concession of Visciotti's guilt as to the felony murder portion of the charges,[8] unlike Swanson, 943 F.2d at 1077, Agajanian did not assert that the evidence against his client was overwhelming, did not concede that his arguments failed to rise to the level of "reasonable doubt," and did not urge the jury to entertain no reservations or regrets about reaching a guilty verdict. Instead, Agajanian explicitly argued at closing that the evidence against his client was "not overwhelming" and that there were factors that could be decided "in favor of innocence" under the "reasonable doubt" standard.
 
 
 37
 Agajanian also argued that the murder was not premeditated and that Visciotti lacked the specific intent to kill. He argued that the murder weapon did not belong to Visciotti; that Visciotti had testified to being "scared," "paranoid," and "spaced out" at the time of the shootings; and that the evidence of planning, including efforts to fool the victims about the defendants' place of residence, suggested that there was no intent to kill. Agajanian also argued that Visciotti was not a cold-blooded killer by emphasizing the role that Visciotti's drug use probably played in the robbery and shootings; noting the fact that Visciotti claimed he was "loaded," that cocaine was found in his blood, and that there is a close link between crime and drug abuse; contending that Visciotti had shot Wolbert from a greater distance than Wolbert testified to; and pointing out that Visciotti had gotten sick and vomited after the shootings.
 
 
 38
 One can question Agajanian's closing argument strategy of arguing that the crime was not premeditated and that Visciotti was not a cold-blooded murderer, since the jury could convict Visciotti of first degree murder under the felony murder rule without finding premeditation or a specific intent to kill. It is important to keep in mind, however, the context in which Agajanian was lawyering. This was a death penalty case in which the prosecution was making a strong effort to portray the murder and attempted murder as cold-blooded, pre-meditated, and execution-like, and virtually no effective defense to the felony murder charge was available for defense counsel to argue. In that context, the focus of Agajanian's closing argument on disproving premeditation and the cold-blooded nature of the murder cannot fairly be characterized as an abandonment of the client, as a jury might be less likely to impose the death penalty on someone convicted of felony murder, as opposed to someone who set out to commit a premeditated murder.[9]
 
 
 39
 Thus, Agajanian's closing argument, emphasizing the role of drugs and the evidence that the killings were not pre-meditated and that the defendant was not cold-blooded, was not an "abandonment" of Visciotti under Cronic, however deficient and ineffective it may have been. We thus conclude that Agajanian's guilt-phase representation did not "make the adversary process itself presumptively unreliable." See Cronic, 466 U.S. at 659 & n. 26, 104 S.Ct. 2039 (emphasis added). Visciotti must therefore satisfy the Strickland test in order to prevail on his claim of ineffective assistance of counsel at the guilt phase of his trial. Id. He has not done so.[10]
 
 
 40
 Accordingly, we conclude that the California Supreme Court's decision that Visciotti failed to make a prima facie case of ineffective assistance of counsel at the guilt phase of the trial was not "objectively unreasonable." Because the record before us does not support a finding of clear error, we conclude that the state court reasonably applied clearly established federal law, as determined by the Supreme Court of the United States; therefore, we affirm the district court's denial of Visciotti's claim of ineffective assistance of counsel at the guilt phase of the trial.
 
 
 41
 B. Agajanian's Performance During the Penalty Phase
 
 
 42
 Strickland also governs Visciotti's claim that he received ineffective assistance of counsel during the penalty phase. Accordingly, to prevail on his penalty phase ineffective assistance of counsel claim, Visciotti must show that Agajanian's performance was deficient and that his deficient performance prejudiced Visciotti's defense. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. To establish prejudice, Visciotti bears the burden of showing that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052. A "reasonable probability" is less than a preponderance: "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id.
 
 
 43
 The California Supreme Court's decision was "contrary to" Supreme Court law because it mischaracterized Strickland's prejudice standard. Instead of evaluating whether there was a reasonable probability that, absent Agajanian's deficient performance, the result of the proceedings would have been different, the California Supreme Court evaluated whether a more favorable result was probable absent Agajanian's deficient performance.[11] The California Supreme Court's evaluation of Visciotti's ineffective assistance of counsel claim at the penalty phase was, therefore, contrary to Supreme Court law. As the Supreme Court recently explained:
 
 
 44
 If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be "diametrically different," "opposite in character or nature," and "mutually opposed" to [the Supreme Court's] clearly established precedent because [the Court] held in Strickland that the prisoner need only demonstrate a "reasonable probability that ... the result of the proceeding would have been different."
 
 
 45
 Williams, 529 U.S. at 405-06, 120 S.Ct. 1495 (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). Visciotti is not entitled to relief, however, unless the California Supreme Court reached an erroneous result that warrants the issuance of a writ. After considering the applicable Supreme Court and Ninth Circuit precedent,[12] we find that Visciotti suffered from ineffective assistance of counsel during the penalty phase and suffered prejudice as a result because "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 104 S.Ct. 2052.
 
 
 46
 1. Agajanian's preparation for and presentation during the penalty phase was deficient.
 
 
 47
 The California Supreme Court assumed that Agajanian's preparation for and presentation at the penalty phase was deficient because Agajanian:
 
 
 48
 (1) failed to investigate and discover mitigating evidence as a result of his ignorance of the types of evidence a jury might consider mitigating; (2) failed to present readily available evidence that would have revealed to the jury the extent to which petitioner was subjected to psychological and physical abuse as a child, the impact the dysfunctional and peripatetic family life had on petitioner's development, and the correlation between these events and petitioner's resort to drugs; (3) failed to prepare, which left him unaware of the scope of the aggravating evidence to be introduced; and (4) delivered an unfocused closing argument, during which he undercut his client's own case by telling the jury that the evidence of petitioner's mental and emotional problems was not mitigating.
 
 
 49
 In re Visciotti, 14 Cal.4th at 353, 58 Cal.Rptr.2d 801, 926 P.2d 987. Having reviewed the record, we conclude that Agajanian's performance was deficient for the reasons described by the California Supreme Court, and, in addition, because Agajanian relied on a defense in mitigation that was factually unsupported and that portrayed Visciotti in an inaccurate and unflattering light.
 
 
 50
 a. Agajanian failed to investigate and discover mitigating evidence about Visciotti.
 
 
 51
 It is clearly established Supreme Court law that the failure to conduct a reasonable investigation constitutes deficient performance. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. In satisfaction of this duty, Agajanian had an "obligation to conduct a thorough investigation of [Visciotti's] background." Williams, 529 U.S. at 396, 120 S.Ct. 1495; see also Mayfield, 270 F.3d at 927; Ainsworth v. Woodford, 268 F.3d 868, 874 (9th Cir.2001). As we have noted, "`[i]t is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase.'" Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir.1999) (quoting Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir.1999) (brackets in original)).
 
 
 52
 Agajanian's performance during the penalty phase was deficient because he conducted essentially no investigation in search of potentially mitigating evidence about Visciotti. Agajanian did not conduct "any formal one-on-one interviews of witnesses familiar with Visciotti's background." Dist. Ct. at 8. Agajanian did not retrieve or review "any records having to do with John Visciotti's background, medical history, school history, history of drug use, juvenile probation, prior convictions, prior incarcerations, or any other material relevant to Visciotti's history." In re Visciotti, 14 Cal.4th at 347, 58 Cal.Rptr.2d 801, 926 P.2d 987. "Agajanian made virtually no effort prior to trial to determine whether friends, relatives, medical records, or institutional records could provide any additional evidence regarding when Visciotti began using drugs, what prompted him to become involved with drugs, what type of drugs he used, how often he used drugs, or whether his drug use could be classified as an addiction." Dist. Ct. at 7.
 
 
 53
 Agajanian's performance during the penalty phase was also deficient because he inadequately developed and presented expert testimony regarding Visciotti's mental health. Two psychiatrists, Dr. Seawright Anderson ("Dr. Anderson") and Dr. Kaushal Sharma ("Dr. Sharma") were appointed by the court to evaluate Visciotti's competence to stand trial and sanity at the time of the offenses, but Agajanian provided neither Dr. Sharma nor Dr. Anderson with the information they needed to provide a competent evaluation. Dist. Ct. at 10-12; In re Visciotti, 14 Cal.4th at 338, 58 Cal.Rptr.2d 801, 926 P.2d 987. Agajanian's failure to provide Drs. Sharma and Anderson with the information they requested was not the product of a tactical decision; he simply failed to do so.
 
 
 54
 Although Agajanian did have a mental health expert, Dr. Broussard, testify for the defense during the guilt phase, he was retained three days before he testified and was unprepared to provide a reliable conclusion about Visciotti's mental state at the time of the offenses. At their only meeting regarding this case, which lasted less than one hour, Agajanian and Dr. Broussard "discuss[ed] diminished capacity," but Agajanian did not give Dr. Broussard any records or Visciotti's videotaped confession and reenactment to assist his evaluation. In re Visciotti, 14 Cal.4th at 339, 58 Cal. Rptr.2d 801, 926 P.2d 987. Dr. Broussard's interview and testing of Visciotti took "no more than two and one-half hours" and was performed "two days after the People rested in the guilt phase of the trial." Id. at 339-40, 58 Cal.Rptr.2d 801, 926 P.2d 987. Dr. Broussard testified at trial that Visciotti "had minimal brain injury of a type associated with impulse disorders," and "that [Visciotti] was not completely aware of what he was doing during the robbery/murder and could not judge the nature and consequences of his acts at the time." Visciotti, 2 Cal.4th at 32, 5 Cal.Rptr.2d 495, 825 P.2d 388. On cross-examination, however, "Dr. Broussard admitted to the jury that, in order to arrive at a reliable conclusion, he needed more time and should have met with Visciotti more than once." Dist. Ct. at 15. During the state habeas hearing, Agajanian acknowledged that he should have hired Dr. Broussard earlier.
 
 
 55
 In addition, Agajanian did not heed recommendations from both Dr. Anderson and Dr. Broussard that Agajanian should arrange for additional psychological testing and evaluation of Visciotti. In his report, Dr. Anderson wrote that Visciotti had repeatedly suffered head injuries, including one that resulted in a brief coma, and had been placed on anti-psychotic medications. Dr. Anderson concluded that Visciotti might have organic brain damage, and recommended that additional tests be performed to "rule out the possibility of organic brain disorder" and to "obtain more information about petitioner's basic personality structure." Id. Dr. Broussard also encouraged Agajanian to retain a licensed clinical social worker to conduct an extensive evaluation of Visciotti's social history. In re Visciotti, 14 Cal.4th at 340, 58 Cal.Rptr.2d 801, 926 P.2d 987. Dr. Broussard advised Agajanian that Visciotti's case "was a very serious case and would require comprehensive investigation and that the cost of the investigations would be approximately $2,500." Id. Agajanian told Dr. Broussard that he "was not willing to take the time for or to pay for" additional investigation, even though he later stated that he believed that "a court would find that [Visciotti] did not have sufficient resources to hire either counsel or expert witnesses or investigators" and would "very likely" declare Visciotti indigent as a matter of law. Dist. Ct. at 5. Agajanian's failure to develop and present testimony regarding Visciotti's mental health amounts to constitutionally deficient performance. See, e.g., Turner v. Duncan, 158 F.3d 449, 456 (9th Cir.1998) ("failure to arrange a psychiatric examination or utilize available psychiatric information... falls below acceptable performance standards"); Hendricks v. Calderon, 70 F.3d 1032, 1043 (9th Cir.1995) (failure to investigate defendant's mental condition as a mitigating factor after being notified that defendant may be mentally impaired constitutes ineffective assistance of counsel).
 
 
 56
 b. Agajanian failed to present readily available mitigating evidence about Visciotti's background.
 
 
 57
 As a result of his failure to investigate Visciotti's background, Agajanian did not uncover or present evidence during the penalty phase that was later described at Visciotti's state habeas proceeding as "overwhelming mitigating circumstances" in "an absolutely horrendous family history." In re Visciotti, 14 Cal.4th at 341, 58 Cal.Rptr.2d 801, 926 P.2d 987. Extensive mitigating evidence was presented at Visciotti's state habeas hearing by Shirley Reece ("Professor Reece"), a licensed clinical social worker and professor at the University of California at San Francisco, and Dr. Jay Jackman ("Dr. Jackman"), an expert in forensic psychiatry with experience in substance abuse cases. Both Professor Reece and Dr. Jackman spoke with family members and reviewed Visciotti's "hospital, school, probation, Youth Authority and Department of Corrections records ... all of which were available and could have been discovered by Agajanian with reasonable investigation." Id. at 342, 58 Cal. Rptr.2d 801, 926 P.2d 987. The mitigating evidence Professor Reece and Dr. Jackman uncovered — regarding Visciotti's family life, educational history, history of drug use, conduct while incarcerated, and possible brain damage — should have been presented to the jury in Visciotti's penalty phase proceeding.
 
 
 58
 Visciotti's parents' relationship was "extremely volatile, hostile, and mutually abusive, both physically and verbally." Id. at 341, 58 Cal.Rptr.2d 801, 926 P.2d 987. Visciotti and his siblings "were always frightened and worried that the parents would kill each other." Id. "The battles between petitioner's parents involved screaming that could be heard more than a block away." Id. at 343, 58 Cal.Rptr.2d 801, 926 P.2d 987. Visciotti's father held a gun to his mother's head and threatened to kill her in front of Visciotti and his two brothers. Visciotti's mother threw pots of hot coffee and other objects at his father. Visciotti and his siblings "lived a life of terror." Id. at 341, 58 Cal.Rptr.2d 801, 926 P.2d 987.
 
 
 59
 All of the children were "blamed for the family's difficulties, and some were beaten with a belt and slapped." Id. Visciotti's parents were particularly relentless in their abuse of Visciotti. Id. at 342, 58 Cal.Rptr.2d 801, 926 P.2d 987. Part of this abuse was related to the fact that Visciotti was born with club feet, a congenital abnormality. Because of his condition, Visciotti could not walk until he was three years old and had to wear splints and special shoes thereafter. Id. The treatments for Visciotti's condition strained the family financially and required Visciotti's father to borrow money from his parents, which "impacted on[Visciotti's] father's self image." Id. Visciotti's father threatened to break Visciotti's legs, "saying he had paid to have the legs fixed and would break them again." Id. Visciotti's siblings testified at the state habeas hearing that Visciotti's father "continually berated" Visciotti, and his parents called him "an `asshole,' a `mother'" Id. at 341, 58 Cal.Rptr.2d 801, 926 P.2d 987.
 
 
 60
 Visciotti's education suffered as a result of his family situation. "Economic problems and the number of children caused the family to move often which had a profound effect on the children. [Visciotti] left kindergarten after nine days and was not re-enrolled in school for the first grade for two years." Id. Visciotti's family moved at least twenty times when Visciotti was growing up, and the constant moves "impacted[Visciotti's] ability to function in school and in his social world. He was always an outsider." Id. at 343, 58 Cal. Rptr.2d 801, 926 P.2d 987.
 
 
 61
 Visciotti's family situation also took a toll on his self-perception. Visciotti "thought he could never do anything right and could never do anything to please his parents. He was highly self-critical and blamed himself for things for which he had no responsibility such as his parents' difficulties." Id. at 341, 58 Cal.Rptr.2d 801, 926 P.2d 987.
 
 
 62
 By the time he turned eight, Visciotti used drugs to escape his family situation. Id. at 343, 58 Cal.Rptr.2d 801, 926 P.2d 987. Visciotti first used marijuana, then began using alcohol and Seconal, a sedative hypnotic, and then amphetamines. Id. at 343-44, 58 Cal.Rptr.2d 801, 926 P.2d 987. At fifteen, Visciotti began using cocaine, which became his "drug of choice" by age eighteen. Id. at 344, 58 Cal. Rptr.2d 801, 926 P.2d 987. Visciotti also began using PCP. Id. "Most of the criminal conduct in which [Visciotti] engaged occurred during a period when he had progressed to injecting PCP intravenously several times a day in order to have that detached experience." Id. Dr. Jackman testified that "[Visciotti's] criminal behavior was directly related to his drug use," and that Visciotti did not have a "criminal or antisocial personality." Id.
 
 
 63
 Visciotti was tested for a brain abnormality while at the California Youth Authority because he did not seem to be a "typical delinquent." Id. at 343, 58 Cal. Rptr.2d 801, 926 P.2d 987. An abnormal electroencephalogram reflected a possible seizure disorder. Id. Visciotti was prescribed Dilantin, an anti-seizure medication, and "[w]hile taking the medication [he] did not abuse drugs and his behavior was significantly improved." Id. Dr. Jackman testified that, throughout his time at the California Youth Authority, Visciotti "was not a behavior problem and did all jobs expected of him." Id.
 
 
 64
 Agajanian's failure to investigate and present any of this evidence was not the product of a reasoned tactical decision. Agajanian asserted that, after reviewing Visciotti's videotaped confession and reenactment, he concluded that he would not conduct the investigation necessary to pursue a "sympathy defense" based upon Visciotti's upbringing because he did not think that any jury could feel sympathy for Visciotti. As Agajanian explained:
 
 
 65
 The bottom line is I could not imagine, no matter how terrible his childhood could have been, I could not imagine why a jury would care even a little bit about what happened to a person when he was born or what happened to a person when he was in school or whether he got to play little league or not or whether his father was physically abusive or mentally abusive to him or whether his mother was physically or mentally abusive.
 
 
 66
 Agajanian's decision not to pursue a sympathy defense based on Visciotti's background cannot be viewed as strategic because it was entirely unfounded. As Agajanian acknowledged, he "chose not to pursue a sympathy defense on behalf of John Visciotti individually ... without knowing what [he] might find if [he] did." Indeed, Agajanian shielded himself from information that might prove his strategy wrong. Agajanian specifically told Dr. Broussard that he "did not want an opinion on childhood abuse in the report or for Dr. Broussard to indicate that there was any problem in the family, no matter how important information about the family was." Id. at 340, 58 Cal.Rptr.2d 801, 926 P.2d 987. Agajanian's failure to conduct even a preliminary review of Visciotti's background in order to determine what mitigating evidence might exist is unjustifiable.
 
 
 67
 Moreover, Agajanian's conclusion that information about Visciotti's background could not mitigate Visciotti's punishment is unreasonable. As the Supreme Court has recognized, "`evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.'" Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (quoting California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring)). Agajanian's decision not to seek any mitigating evidence because of the seriousness of Visciotti's crime reflects that Agajanian "did not understand how evidence of a person's background could be used to call for a sentence less than death when the crime was a serious homicide." Dist. Ct. at 49.
 
 
 68
 In sum, Agajanian was ineffective during the penalty phase because he did not "fulfill [his] obligation to conduct a thorough investigation of [Visciotti's] background," and failed to introduce the "voluminous amount of evidence that did speak in [Visciotti's] favor." Williams, 529 U.S. at 396, 120 S.Ct. 1495.
 
 
 69
 c. Agajanian relied on a strategy in mitigation that was factually unsupported and that portrayed Visciotti in an inaccurate and unflattering light.
 
 
 70
 Instead of investigating and presenting the wealth of available mitigating evidence about Visciotti's upbringing and history, Agajanian decided, after viewing Visciotti's videotaped confession, that his strategy during the mitigation phase would be to evoke sympathy for the Visciotti family. Agajanian pursued this "family sympathy" mitigation strategy because "[h]e believed that, although sympathy for petitioner could not be expected, sympathy for petitioner's parents might be" and "[h]is defense would therefore suggest that the parents were nice people whose son should not be killed." In re Visciotti, 14 Cal.4th at 336, 58 Cal.Rptr.2d 801, 926 P.2d 987.
 
 
 71
 Agajanian's family sympathy mitigation strategy had little factual support. At the time Agajanian decided to pursue the family sympathy strategy, Agajanian had not "conduct[ed] formal interviews with any members of petitioner's family," he had done "no investigation ... to seek potentially mitigating evidence," and he had "no information about petitioner's background other than what appeared to him to be `good aspects' of the family." Id. at 337, 58 Cal.Rptr.2d 801, 926 P.2d 987.
 
 
 72
 Agajanian's family sympathy mitigation strategy was inconsistent with the little that Agajanian found out about the Visciotti family. When Agajanian decided that he would pursue a family sympathy strategy, he was aware that there was "some brutality in the family" and some "possible family discord" during Visciotti's youth. Id. He decided not to investigate these allegations, however, because, Agajanian declared, he "was not interested in making [Visciotti's] father or mother or brothers or sisters out to be monsters because they had sat through the entire trial and supported him throughout the trial." Agajanian's decision that it was more important to preserve the Visciotti family's pride or dignity than it was to prevent his client from receiving the death penalty cannot be viewed as a reasonable basis to forego investigation. As the California Supreme Court "assume[d] arguendo," "since Agajanian apparently was put on notice of possible family discord during petitioner's youth, his decision to present a `family sympathy' defense without investigation to determine the nature of the evidence that was available was not a decision that a competent attorney representing a capital defendant would make." Id. at 348, 58 Cal.Rptr.2d 801, 926 P.2d 987.
 
 
 73
 As a result of his mitigation strategy, Agajanian portrayed Visciotti in an unflattering light that Agajanian knew to be inaccurate. Agajanian portrayed Visciotti as his family's only "bad seed," while knowing that Visciotti's brother had been arrested for drunk driving and Visciotti's sister had been arrested for possession of methamphetamine. Dist. Ct. at 7. Indeed, during Visciotti's state habeas hearing, members of Visciotti's family confirmed that, "contrary to the evidence offered at the penalty phase, [Visciotti] was not the only `bad seed' in an otherwise loving family." In re Visciotti, 14 Cal.4th at 345, 58 Cal.Rptr.2d 801, 926 P.2d 987.
 
 
 74
 The Supreme Court has instructed that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052. Agajanian's mitigation strategy was deficient because it was not the product of a reasonable investigation. Particularly in light of the extensive evidence of Visciotti's physical and mental abuse by his parents, Agajanian's portrayal of Visciotti as the one bad seed in the Visciotti family cannot be considered a reasonable penalty phase strategy.
 
 
 75
 d. Agajanian was unprepared to respond to the prosecution's aggravating evidence.
 
 
 76
 Agajanian's performance during the penalty phase was also deficient because he did not investigate and was not prepared to respond to the prosecution's case in aggravation. Five months before trial began, the prosecutor filed a notice that he intended to introduce, as evidence in aggravation, evidence related to the instant offense and Visciotti's prior conviction for assault with a deadly weapon. Dist. Ct. at 9. Despite this notice, and "[a]lthough it was the practice of the district attorney at the time of the Visciotti trial to make the case files of prosecutors available to defense counsel ... Agajanian did not send for the police report or go through the prosecutor's file to read it in advance of trial." In re Visciotti, 14 Cal.4th at 340, 58 Cal.Rptr.2d 801, 926 P.2d 987. Agajanian's failure to investigate the assault in preparation for the penalty phase — after learning the details of the assault during the prosecution's rebuttal in the guilt phase — is even less defensible as a strategic decision. Agajanian explained that he did not investigate the assault in preparation for the penalty phase because Cusack was an extremely sympathetic victim. Although Agajanian's reasoning might have explained his decision not to pursue a certain line of questioning at trial, it does not justify his failure to investigate the circumstances of the assault.
 
 
 77
 Agajanian also failed to investigate or introduce any evidence during the penalty phase to mitigate the circumstances of the capital offense. Agajanian did not interview Wolbert, the surviving victim, or Hefner, Visciotti's co-perpetrator, nor did he review the transcript of Hefner's trial. Agajanian also failed to introduce — beyond that introduced at the guilt phase — mitigating evidence regarding the circumstances of the offense: that the gun used to shoot Dykstra and Wolbert belonged to Hefner, that Visciotti did not plan to shoot Wolbert or Dykstra, that Visciotti shot Dkystra only after Hefner gave Visciotti the gun and repeatedly encouraged him to shoot, and that Visciotti had injected himself with cocaine a few hours before the robbery and murder occurred. Dist. Ct. at 28. Agajanian has not offered a reasonable explanation for his failure to conduct this minimal investigation or marshal the available mitigating evidence regarding the circumstances of the capital offense.
 
 
 78
 Agajanian's failure to investigate Visciotti's prior felony assault conviction and his failure to investigate and present mitigating evidence regarding the circumstances of the capital offense cannot be justified as strategic decisions. See, e.g., Turner, 158 F.3d at 456 (attorney's failure to investigate the prosecution's case "falls below minimum standards of competent representation").
 
 
 79
 e. Agajanian undercut Visciotti's case during closing argument.
 
 
 80
 Agajanian "delivered an unfocussed closing argument, during which he undercut his client's case by telling the jury that the evidence of petitioner's mental and emotional problems was not mitigating." In re Visciotti, 14 Cal.4th at 353, 58 Cal.Rptr.2d 801, 926 P.2d 987. As the district court found, Agajanian "conceded that nine of the eleven statutory sentencing factors in California Penal Code § 190.3 favored the prosecution without even mentioning the existence of evidence that would support a mitigating interpretation of several of those factors."[13] Dist. Ct. at 27.
 
 
 81
 In his closing argument, Agajanian told the jury that there was no mitigating evidence related to factor (a), the circumstances of the crime, because "there's no way to make light of any kind of murder, whether or not there's a robbery involved." Agajanian also told the jury that there was no mitigating evidence related to factors (g) and (j), as there was "no evidence" of "extreme duress," apparently referring to the jury's ability to consider whether Visciotti was acting "under the substantial domination of another," and no evidence that Visciotti was an accomplice because Visciotti was, "as the People said, the trigger man." These three concessions were contrary to evidence that the gun used to shoot Dykstra and Wolbert belonged to Hefner, that Visciotti did not plan to shoot Wolbert or Dykstra, that Visciotti shot Dkystra only after Hefner gave Visciotti the gun and repeatedly encouraged him to shoot, and that Visciotti had injected himself with cocaine a few hours before the robbery and murder occurred. Dist. Ct. at 28.
 
 
 82
 Agajanian also discounted the effect of mitigating evidence that was submitted during the guilt and penalty phases of Visciotti's trial. Agajanian told the jury that there was no evidence of factor (d), that "the offense was committed while the defendant was under the influence of extreme mental emotional disturbance." Agajanian said: "with respect to emotional disturbance, there's no evidence of that. That isn't even a factor to be considered." Agajanian also told the jury that they could disregard factor (h), which concerned whether Visciotti's capacity to appreciate the wrongfulness of his conduct "was impaired as a result of mental disease or defect or ... intoxication" because:
 
 
 83
 when you ladies and gentlemen returned this verdict of first degree murder and found special circumstances, you indicated to all of us that you did not find diminished capacity. So if you did not find diminished capacity, how can I argue that as a factor of aggravation or mitigation? It just does not apply. It's not there. I think when you ladies and gentlemen found that — you basically found that diminished capacity did not reduce the nature of the robbery to something less than a robbery, or the nature of the first degree murder to something less than first degree murder. So that's not a factor of mitigation.
 
 
 84
 Dist. Ct. at 29.
 
 
 85
 Agajanian conceded the inapplicability of factors (d) and (h) despite evidence submitted at the guilt phase that Visciotti was intoxicated at the time of the offense and that Visciotti suffered from a minimal brain injury that caused an impulse and learning disorder. Dist. Ct. at 30. Agajanian's concessions reflect his failure to recognize that the jury could consider Agajanian's intoxication and brain damage during the penalty phase, even if the evidence was insufficient to establish a legal defense in the guilt phase. In re Visciotti, 14 Cal.4th at 354 n. 7, 58 Cal. Rptr.2d 801, 926 P.2d 987. See also Hendricks, 70 F.3d at 1043 ("[e]vidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense to conviction in the guilt phase") (citing Cal.Penal Code § 190.3(d),(h)).
 
 
 86
 Although Agajanian did not concede outright the inapplicability of two of the mitigating factors — "age" and "sympathy" — he hardly advocated for a sentence less than death on account of those factors. Regarding Visciotti's age, Agajanian said: "The age of the defendant. I happen to consider 26 years of age a rather young age." Regarding sympathy, Agajanian said that it "should be an issue to consider." As the District Court observed, however, "Mr. Agajanian did not argue that factor (k) was `present' or that it `favored the defense.' ... Indeed, he did not identify any evidence that would warrant sympathy for Visciotti (or his family) and, if so, why the jurors should rely on such pity or sympathy as a basis for returning a sentence other than death." Dist. Ct. at 83.
 
 
 87
 Agajanian's failure to investigate and present extensive mitigating evidence about Visciotti's background was unreasonable, his decision not to pursue a mitigation strategy based on Visciotti's background was uninformed, and his failure to develop and present expert testimony regarding Visciotti's mental health was unjustified. The mitigation strategy Agajanian did pursue, based on sympathy for Visciotti's family, presented Visciotti in an unflattering light that Agajanian knew to be inaccurate. Agajanian was utterly unprepared to respond to the prosecution's case in aggravation. In his closing argument, Agajanian affirmatively conceded several mitigating factors that a reasonable juror might well have applied to the facts, while offering the jury no other reason not to impose the death penalty. In sum, Agajanian's performance throughout the penalty phase was deficient.
 
 
 88
 2. Visciotti was prejudiced by Agajanian's deficient performance during the penalty phase.
 
 
 89
 In addition to showing Agajanian's deficient performance, Visciotti must show prejudice: that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings." Id. We must affirm the district court's reversal of Visciotti's death sentence if we "cannot conclude with confidence that the jury would unanimously have sentenced him to death if [Agajanian] had presented and explained all of the available mitigating evidence." Mayfield, 270 F.3d at 929.
 
 
 90
 We conclude that, in light of the abundant mitigating evidence that Agajanian failed to introduce, Agajanian's inaccurate portrayal of Visciotti as the one "bad seed" in his family, Agajanian's absolute failure to counter the prosecution's case in aggravation, and, perhaps most importantly as to prejudice, Agajanian's closing argument, which conceded several potential mitigating factors while providing the jurors essentially no reason not to impose the death penalty, there is a "reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." Strickland, 466 U.S. at 700, 104 S.Ct. 2052. See also, e.g., Williams, 529 U.S. at 398, 120 S.Ct. 1495; Karis v. Calderon, 283 F.3d 1117, 1140 (9th Cir.2002); Mayfield, 270 F.3d at 933; Hendricks, 70 F.3d at 1045.
 
 
 91
 As noted, the California Supreme Court did not apply the "reasonable probability" standard, so its decision as to prejudice was contrary to clearly established Supreme Court law. Even if the California Supreme Court had correctly applied the prejudice prong of the Strickland standard, however, its conclusion that Visciotti suffered no prejudice as a result of Agajanian's deficiencies would be objectively unreasonable, because it "failed to evaluate the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — in reweighing it against the evidence in aggravation." Williams, 529 U.S. at 398, 120 S.Ct. 1495 (citation omitted). The California Supreme Court concluded that Agajanian's failure to introduce additional evidence about Visciotti's "troubled family background" was not prejudicial because it would not have outweighed the aggravating evidence of "[t]he circumstances of the crime" and "the earlier knifing of William Scofield and the pregnant Kathy Cusack." In re Visciotti, 14 Cal.4th at 355, 58 Cal. Rptr.2d 801, 926 P.2d 987. The California Supreme Court did not, however, take into account the totality of the available mitigating evidence, and completely ignored the mitigating effect of Visciotti's brain damage or adjustment to incarceration. The California Supreme Court also failed to consider the prejudicial impact of: (1) Agajanian's portrayal of Visciotti as the one "bad seed" in the Visciotti family; and (2) Agajanian's multiple concessions during closing argument. Because the California Supreme Court failed to consider the potential impact of all of the mitigating evidence that was available to Agajanian, and failed to consider the prejudicial impact of Agajanian's representation — particularly his closing argument, which was more effective in persuading the jury to impose the death penalty than it was in convincing them to spare his life — its application of Supreme Court law was objectively unreasonable.
 
 
 92
 The state argues that the California Supreme Court's conclusion that no prejudice resulted was objectively reasonable because the aggravating evidence was overwhelming. The record reflects, however, that the aggravating factors were not overwhelming, as the jury deliberated a full day and then requested additional guidance on the definitions of "moral justification" and "extreme duress." Cf. Bean v. Calderon, 163 F.3d 1073, 1081 (1998) (the fact that the jury was initially divided over the appropriateness of the death penalty, despite the attorney's failure to present mitigating evidence, "undermine[s] confidence in the outcome" of the petitioner's penalty phase hearing). The fact that the jury struggled despite Agajanian's deficient performance reflects a reasonable probability that they would have returned a life verdict had they had the opportunity to hear and consider the available mitigating evidence, had Visciotti not been inaccurately portrayed as the one "bad seed" in the Visciotti family, and had Agajanian not advised the jury in his closing argument against considering mitigating factors that could have outweighed the aggravating factors.
 
 
 93
 Accordingly, having reviewed the applicable federal precedents, we conclude that Visciotti received ineffective assistance of counsel during the penalty phase and that he was prejudiced as a result. The California Supreme Court's conclusion that Visciotti did not suffer prejudice as a result of Agajanian's deficient performance during the penalty phase is both contrary to clearly established Supreme Court law and is objectively unreasonable.
 
 CONCLUSION
 
 94
 For the foregoing reasons, we affirm the district court's decision to deny habeas relief on Visciotti's ineffective assistance of counsel claim during the guilt phase and affirm the district court's decision to grant habeas relief on Visciotti's ineffective assistance of counsel claim during the penalty phase.
 
 
 95
 We remand to the district court with directions to issue the writ of habeas corpus vacating the sentence of death, and conditionally requiring the imposition of a sentence of life imprisonment without the possibility of parole, unless the state grants Visciotti a new penalty phase trial within a reasonable period of time to be set by the district court.
 
 
 96
 AFFIRMED and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 We review a district court's decision to dismiss a petition for writ of habeas corpus de novoMiles v. Prunty, 187 F.3d 1104, 1105 (9th Cir.1999).
 
 
 [2]
 In December 1985, while representing Visciotti on appeal, Agajanian was convicted of two counts of criminal contempt in the District of VermontIn re Visciotti, 14 Cal.4th at 349 n. 6, 58 Cal.Rptr.2d 801, 926 P.2d 987. "Evidence was admitted at the [state habeas] evidentiary hearing that during the time he represented [Visciotti], Agajanian did not respond to client communications, failed to make court appearances, did not visit clients in jail or show up in court or other places as promised, and was distracted by a civil suit against a non-lawyer who shared his office." Id.
 
 
 [3]
 Under California law, a defendant who is found guilty of first degree murder will be sentenced to death or life imprisonment without the possibility of parole if one or more "special circumstances" are found. Cal.Penal Code § 190.2. The statute includes twenty-two "special circumstances," among them that "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" several felonies, including robbery. Cal.Penal Code § 190.2(17)
 
 
 [4]
 Cusack was called as a rebuttal witness during the penalty phase
 
 
 [5]
 The referee was a judge of the Orange County Superior CourtSee In re Visciotti, 14 Cal.4th at 329, 58 Cal.Rptr.2d 801, 926 P.2d 987.
 
 
 [6]
 Visciotti v. Calderon, No. CV 97-4591 R (C.D. Cal. filed Oct. 8, 1999). The district court's opinion will be referred to as: "Dist. Ct."
 
 
 [7]
 Visciotti's petition is governed by the standards of 28 U.S.C. § 2254 because his habeas petition was filed after the effective date of the Anti-Terrorism and Effective Death Penalty Act, the statute which enacted the current standards governing the granting of the writ of habeas corpusSee Lockhart v. Terhune, 250 F.3d 1223, 1228 (9th Cir.2001).
 
 
 [8]
 The dissent argues that Agajanian conceded Visciotti's guilt of felony murder twice in his closing argument. Both statements, however, were made in the context of Agajanian's efforts to distinguish felony murder from premeditated murder. Thus, the first statement was nothing more than counsel's statement of the law of felony murder, rather than an admission of what the evidence showed. In his second statement, Agajanian pointed out that even if the jury were to find Visciotti guilty of first degree murder, it must still conclude that the killing was "not premeditated."
 
 
 [9]
 The dissent argues that we have inappropriately "hypothesized" a strategy on behalf of Agajanian by recognizing his efforts to distinguish felony murder from premeditated murder as a not unreasonable strategy. We note that, after the verdict was returned, Agajanian attempted to ascertain whether the verdict was based on felony murder or premeditated murder. The trial judge, however, did not permit the jury to be polled on that question. Thus, we have simply made a "fair assessment of attorney performance" by considering the circumstances under which Agajanian's challenged conduct took placeSee Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (holding that because of the difficulty of making such a fair assessment, "the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy'" (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955))).
 
 
 [10]
 We note that, while we takeSwanson into account in applying Cronic, Swanson does not independently qualify as "clearly established Federal law, as determined by the Supreme Court of the United States," as required by 28 U.S.C. § 2254(d)(1), in order to serve as a ground for issuance of the writ. See Van Tran, 212 F.3d at 1149.
 
 
 [11]
 See Visciotti, 14 Cal.4th at 330, 58 Cal. Rptr.2d 801, 926 P.2d 987 (Visciotti "ha[d] not demonstrated that ... absent [Agajanian's] failings it is probable that a more favorable result would have been reached by the penalty jury") (emphasis supplied); id. at 355, 58 Cal.Rptr.2d 801, 926 P.2d 987 ("We cannot conclude that it is probable that the jury would have found that the evidence of petitioner's troubled family background itself would have outweighed th[e] aggravating evidence") (emphasis supplied); id. at 356, 58 Cal.Rptr.2d 801, 926 P.2d 987 ("Under the circumstances it is not probable that the jury would have found evidence that petitioner's childhood was troubled or that he turned to drugs as a means of escape from an unbearable family situation mitigating or sufficiently so that the evidence would have affected the jury determination that the aggravating factors outweighed the mitigating in this case") (emphasis supplied).
 
 
 [12]
 Although "clearly established law" for the purposes of 28 U.S.C. § 2254, is the "holdings, as opposed to the dicta, of th[e] Court's decision as of the time of the relevant state court decision,"Williams, 529 U.S. at 412, 120 S.Ct. 1495, "we still look to our own law for its persuasive authority in applying Supreme Court law," Van Tran, 212 F.3d at 1154.
 
 
 [13]
 Among the eleven factors a jury is instructed to consider when deciding whether to impose life imprisonment or death are: (a) "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding";... (d) "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance"; ... (g) "[w]hether or not defendant acted under extreme duress or under the substantial domination of another person"; (h) "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication"; (i) "[t]he age of the defendant at the time of the offense"; (j) "[w]hether or not the defendant was an accomplice to the offense and his participation in the offense was relatively minor"; (k) "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Cal.Penal Code § 190.3 (emphases supplied).
 
 
 
 97
 PREGERSON, Circuit Judge, dissenting.
 
 
 98
 The majority denies Visciotti's claim of ineffective assistance of counsel during the guilt phase on the ground that Agajanian's performance, while arguably deficient, did not prejudice the outcome of Visciotti's trial. I believe that Agajanian's deficient performance during the guilt phase was per se prejudicial pursuant to the Supreme Court's decision in United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Accordingly, I dissent from Section III A of the majority opinion.
 
 
 99
 In Cronic, the Supreme Court identified certain circumstances where counsel's performance is "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," including where a defendant "is denied counsel at a critical stage of his trial" and where counsel "fails to subject the prosecution's case to meaningful adversarial testing." Id. at 658-59, 104 S.Ct. 2039. I believe that Agajanian abandoned Visciotti at a "critical stage" of the guilt phase of trial and "fail[ed] to subject the prosecution's case to meaningful adversarial testing" because he conceded that Visciotti was guilty of first degree murder during his closing argument. Id. at 659, 104 S.Ct. 2039. Agajanian's concession merits a finding of prejudice per se.
 
 
 100
 Although Agajanian delivered an unorganized and at times incoherent closing argument, his concession that Visciotti committed first degree murder is unmistakable. Agajanian told the jury that Visciotti was guilty of first degree murder if they found that "an implied malice killing of a human being" occurred "during the course of a robbery," and then said: "Ladies and Gentlemen, that is what the facts reflect. That is what the facts reflect in this particular case." (Emphasis supplied). Agajanian concluded his closing argument at the guilt phase by again acknowledging that Visciotti committed first degree murder. He said:
 
 
 101
 I think the bottom line in this case, ladies and gentlemen, if we evaluate it from the evidence, if we evaluate it from what we have before us, the good, the bad, the ugly, I think that, plus the employment of the reasonable doubt standard in this particular case will lead you to a verdict, even though it be first degree murder, that we have a killing which is not premeditated, which is not deliberated, which is not well thought out, which is not pondered, but, nevertheless, committed.
 
 
 102
 (Emphasis supplied).
 
 
 103
 In Swanson, we found that Cronic applied when a lawyer conceded his client's guilt at trial, reasoning that "[a] lawyer who informs the jury that it is his view of the evidence that there is no reasonable doubt regarding the only factual issues that are in dispute has utterly failed to `subject the prosecution's case to meaningful adversarial testing.'" United States v. Swanson, 943 F.2d 1070, 1074 (9th Cir. 1991) (quoting Cronic, 466 U.S. at 659, 104 S.Ct. 2039). In this case, as in Swanson, the trial "los[t] its character as a confrontation between adversaries" when Agajanian conceded that Visciotti committed first degree murder. Id. at 1073.
 
 
 104
 The majority argues that Agajanian did not abandon Visciotti during his closing argument because Agajanian argued to the jury that "the crime was not premeditated" and "Visciotti lacked the specific intent to kill." However, once Agajanian conceded that Visciotti committed felony murder, these arguments about Visciotti's state of mind during the killing became irrelevant. As Agajanian explained to the jury during his closing argument, a killing during the commission of felony robbery is first degree murder regardless of the defendant's state of mind.
 
 
 105
 The majority also hypothesizes that Agajanian's concession was a strategic attempt to avoid the imposition of the death penalty, reasoning that "a jury might be less likely to impose the death penalty on someone convicted of felony murder, as opposed to someone who set out to commit a premeditated murder." This hypothesis is unsupported by Agajanian's closing argument during the penalty phase, in which he told the jury that there was no mitigating evidence related to the circumstances of the crime or Visciotti's mental state. This hypothesis is also unsupported by Agajanian's testimony, during the state habeas hearing, that the family sympathy mitigation strategy was his only strategy to avoid imposition of the death penalty. Just as we cannot evaluate the reasonableness of counsel's strategic decisions through the "distorting effects of hindsight," we cannot, in hindsight, attribute to counsel a strategy that he did not actually have in order to make sense of his otherwise inexplicable conduct. Strickland, 466 U.S. at 689, 104 S.Ct. 2052.
 
 
 106
 There is no doubt that this case was a difficult one to defend. However, as the Supreme Court instructed in Cronic, "even when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt." 466 U.S. at 656 n. 19, 104 S.Ct. 2039. In conceding that Visciotti was guilty of felony murder, Agajanian relieved the prosecution of this heavy burden.